**ORIGINAL**

Towaki Komatsu
802 Fairmount Pl. Apt. 4B
Bronx, NY 10460
Tel: 718-450-6951
E-mail: Towaki_Komatsu@yahoo.com



September 6, 2019

Hon. Cheryl Pollack
United States Magistrate District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:    Hikind v. Ocasio-Cortez,
             No. 19-cv-3956 (FB)(CLP) (E.D.N.Y.)

Dear Magistrate Judge Pollack,

My name is Towaki Komatsu. I'm filing this letter pursuant to FRCP Rule 24 that concerns intervention both as of right and by permission in order to be granted the ability to intervene in this action as an interested party against Andrea Ocasio-Cortez. Under Rule 24(a)(2), a district court must grant an applicant's motion to intervene if "(1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by other parties." Rule 24(b)(1) addresses permissive intervention and states, "the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24. "When considering a request for permissive intervention, a district court must 'consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."

The case in which I seek to intervene concerns the following transactions in which I claim an interest:

1. Decisions that the defendant or someone acting on her behalf with her consent have taken that have caused the plaintiff to have a Twitter account that he uses to be blocked by a Twitter account that the defendant uses.

2. Such actions that persist against the defendant in spite of the fact that the following pertinent court decisions have been issued:

    a. *Knight First Amendment Institute v. Trump*, No. 18-1691-cv (2d Cir. July 9, 2019).

    b. *Matal v. Tam*, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017).

    c. *Barboza v. D'Agata*, 151 F. Supp. 3d 363 (S.D.N.Y. 2015).

    d. *Cohen v. California*, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971).

    e. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72 (2d Cir. 2015).

In *Knight First Amendment Institute v. Trump*, No. 18-1691-cv (2d Cir. July 9, 2019), Donald Trump was ordered to stop blocking Twitter accounts with a Twitter account that he uses for the same reasons why this Court must follow that precedent. In short, the Twitter accounts that Mr. Trump uses and were the subject of that case were regarded to be public forums. The judges assigned to that case determined that Mr. Trump was unlawfully subjecting people to viewpoint discrimination in violation of their First Amendment rights by blocking their Twitter accounts with Twitter accounts that he uses. On 3/26/19, the United States Court of Appeals for the Second Circuit conducted a hearing for the presentation or oral arguments in that case. While doing so, that court permitted a news organization named C-Span to make a video recording of that hearing. The video recording that it recorded of that oral arguments hearing is available on

the Internet at the following address:

https://www.c-span.org/video/?459092-1/circuit-hears-oral-argument-presidents-twitter-account-case

That video recording confirms that United States Judge Christopher Droney made remarks to the following effect at the elapsed time of 13 minutes and 2 seconds from the start of that recording:

> "For the First Amendment, it doesn't really have to be much more burdensome. If it's more burdensome at all...If you have to move down the street, that violates the First Amendment."

Judge Droney made the preceding remarks in regards to a discussion that concerned extra burdens being imposed on individuals to have access to public forums.

When the United States Supreme Court issued its decision in Matal v. Tam, 137 S. Ct. 1744, 582 U.S., 198 L. Ed. 2d 366 (2017), it included the following pertinent finding in its decision that directly addresses First Amendment rights and viewpoint discrimination:

> "giving offense is a viewpoint."

When the United States District Judge Cathy Seibel of the United States District Court for the Southern District issued her decision in Barboza v. D'Agata, 151 F. Supp. 3d 363 (S.D.N.Y. 2015)., she included the pertinent findings shown in the following long excerpt that confirms that the use of crude and offensive expression by people is protected First Amendment expression when it **a)** is done towards government officials in the context of complaining about government activity and **b)** does not constitute a true threat:

> "In People v. Mangano, 100 N.Y.2d 569, 570, 764 N.Y.S.2d 379, 796 N.E.2d 470, the New York Court of Appeals in 2003 upheld an as applied challenge to section 240.30(1) where the defendant left five voice messages on the Village of Ossining Parking Violations Bureau's answering machine in which the defendant rained invective on two village employees, wished them and their family ill health, and complained of their job performance as well as the tickets that she had received. Mangano, 570. The Court of Appeals found this was in the scope of protected speech because defendant's messages were crude and offensive but made in the context of complaining about government action on a telephone answering machine set up for the purpose, among others, of receiving complaints from the public. Mangano 571.

That decision is on all fours with this case. It dealt with offensive language used to express to government employees dissatisfaction with government action. Indeed, the conduct in *Mangano* was arguably closer than plaintiff's to the realm of unprotected threats because it was repeated, directed at specific persons and wished them harm. And Mangano is in *372 line with well-settled Supreme Court and Second Circuit precedents cited above to the effect that only fighting words and true threats, rather than crude or offensive critiques of government can be penalized. See for example, <u>Texas v. Johnson, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342</u> where the Court described flag burning as a generalized expression of dissatisfaction with the policies of the federal government rather than a direct personal insult or invitation to exchange fisticuffs; <u>Cohen, 403 U.S. at 16, 20, 91 S.Ct. 1780</u> where the court said wearing a jacket saying "fuck the draft" did not amount to fighting words; and <u>Posr, 180 F.3d at 415</u> where "one day you're going to get yours" was held not to amount to fighting words. That the court clerks who received plaintiff's message was apparently alarmed by it does not alter the analysis. Whether a right is clearly established is assessed in light of the legal rules that were clearly established at the time. <u>Pearson v. Callahan, 555 U.S. 223, 244, 129 S.Ct. 808, 172 L.Ed.2d 565</u>. And under the applicable case law, plaintiff's message could not have been considered fighting words or true threats."

When the United States Supreme Court issued its decision in <u>Cohen v. California, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971)</u>, it included the following pertinent finding in its decision that directly addresses First Amendment rights and viewpoint discrimination:

> "Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. See, e. g., <u>Organization for a Better Austin v. Keefe, 402 U. S. 415 (1971)</u>. While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, e. g., <u>Rowan v. Post Office Dept., 397 U. S. 728 (1970)</u>, we have at the same time consistently stressed that "we are often 'captives' outside the sanctuary of the home and subject to objectionable speech." *Id.*, at 738. The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections."

In <u>Cohen v. California, 403 U.S. 15, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971)</u>, the United States Supreme Court further demonstrated firm and explicit support for First Amendment rights through the following additional pertinent findings that were included in that court decision:

Page 4 of 20

- ""[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures—and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." <u>Baumgartner v. United States</u>, 322 U. S. 665, 673674 (1944)."

- "it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual."

In <u>Vega v. Hempstead Union Free School Dist.</u>, 801 F.3d 72 (2d Cir. 2015), the U.S. Court of Appeals for the Second Circuit addressed discriminatory intent and fraudulent pretexts in the following findings from that decision while acknowledging that there often is no smoking gun with which to prove discriminatory intent:

> "Second, in making the plausibility determination, the court is to "draw on its judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at 679, 129 S.Ct. 1937. Of course, the court must proceed at all times in a fair and deliberative fashion, alert to any unconscious bias that could affect decisionmaking.[9] In making the plausibility determination, the court must be mindful of the "elusive" nature of intentional discrimination. *See* <u>Burdine, 450 U.S. at 255 n. 8, 101 S.Ct. 1089</u>. As we have recognized, "clever men may easily conceal their motivations." <u>Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1043 (2d Cir.1979)</u> (internal quotation marks omitted). Because discrimination claims implicate an employer's usually unstated intent and state of mind, *see* <u>Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985)</u>, rarely is there "direct, smoking gun, evidence of discrimination," <u>Richards v. N.Y.C. Bd. of Educ., 668 F.Supp. 259, 265 (S.D.N.Y.1987)</u>, *aff'd*, 842 F.2d 1288 (2d Cir.1988). Instead, plaintiffs usually must rely on "bits and pieces" of information to support an inference of discrimination, *i.e.*, a "mosaic" of intentional discrimination. <u>Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir.1998)</u>, *abrogated in part on other grounds by* <u>Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)</u>. Again, as we made clear in *Littlejohn*, at the initial stage of a litigation, the plaintiff's burden is "minimal" — he need only plausibly 87*87allege facts that provide "at least minimal support for the proposition that the employer was motivated by discriminatory intent." 795 F.3d at 311, 2015 WL 4604250, at *8."

My interest in the transactions that are the subject of this action is due to the following facts:

1. The transactions that are the subject of this action concern being blocked from a public forum by a government official.

2. New York City Councilmen Ritchie Torres, Chaim Deutsch, and Barry Grodenchik continue

to illegally block me from identical public forums. This is due to the fact that a Twitter account that I use is blocked by Twitter accounts that they use that are public forums.

3. Between 4/27/17 and 3/18/19, members of the NYPD security detail for New York City Mayor Bill de Blasio ("the Mayor"), members of the Mayor's staff, and other members of the Mayor's administration willfully committed illegal acts against me in violation of my rights pursuant to the First Amendment, Fifth Amendment, Fourteenth Amendment, and New York State's Open Meetings Law to a) prevent me from attending public forums that the Mayor conducted and b) otherwise illegally discriminate against me at those public forums to subject me to illegal segregation by restricting my attendance at them to an overflow room instead of the room in which the Mayor conducted them as he did so. The public forums at which such illegal acts were committed against me by government officials and members of the NYPD that the Mayor condoned as they occurred and thereafter exceeded 15 such public hearings and were comprised of public town hall meetings, public resource fair meetings, public hearings, and publicity stunts that the Mayor illegally conducted in public areas. Due to those illegal acts, I filed an entirely valid federal lawsuit that corresponds to *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG) (S.D.N.Y.). On 8/27/19, Judge Lorna Schofield issued an order in that case in which she authorized me to file a third amended complaint that will enable me to vastly expand the scope of that case. Such illegal acts that were most recently committed against me during a public hearing that the Mayor conducted occurred on 3/18/19 inside of the Blue Room located inside of New York City Hall during a public hearing that concerned labor rights. The following is a link to a copy of a video recording that is available on the Internet that the Mayor's office arranged to be recorded of that public hearing:

https://www.youtube.com/watch?v=rqwyR7ZD23M

During that public hearing that was a public forum, I briefly testified in it. My testimony in that hearing begins at the elapsed time of 16 minutes and 58 seconds in that video recording. The reason why my testimony during that hearing was much briefer than the total amount of time to which I was legally entitled was because of the following pertinent facts:

- The Mayor willfully and illegally interrupted me and subjected me to viewpoint discrimination as I was beginning to lawfully testify against him during that hearing. At that time, I was about to play pertinent video recordings for the benefit of the public's First Amendment right to hear from a whistleblower. Those video recordings were of prior face-to-face conversations that I had with the Mayor about labor matters pertaining to wage-theft by a company named NTT Data, Inc. that persists and that the Mayor's administration does business with that taxpayers are forced to finance to keep a lot of money in the wrong hands.

- As I lawfully asserted my First Amendment rights by resisting the Mayor's illegal interference with my testimony during that hearing, a Black male member of the Mayor's NYPD security detail criminally assaulted, harassed, and ejected me from that public hearing in flagrant violation of my rights pursuant to the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and New York State's Open Meetings Law as well as 18 U.S.C. §245(b)(5).

I am so situated that without intervention, disposition of this action may, as a practical matter, impair or impede my ability to protect my interests. This is true partly for the following reasons:

1. A government official's Twitter account that creates a public forum provides the public with the ability to lawfully communicate with the government official to whom that Twitter

account is assigned, that government official's supporters and opponents, people who are neutral with respect to that government official, and journalists who have the power to widely distribute discussions that the public have with or about government officials.

2. When government officials that include the following people choose to engage in offensive and disorderly conduct and otherwise condone such conduct that is committed in their presence by other government officials and members of the NYPD during **a)** public forums that are comprised of public hearings, public town hall meetings, and public resource fair meetings and **b)** illegal publicity stunts government officials conduct in public areas, government estoppel and equitable estoppel function to bar them from trying to avoid being held accountable for their misconduct in a manner that violates the constitutional rights of others:

    a. The Mayor and members of his administration.

    b. Members of the New York City Council that include, but are not limited to:

    > Ritchie Torres, Chaim Deutsch, Barry Grodenchik, Corey Johnson, Helen Rosenthal, Stephen Levin, Brad Lander, Rory Lancman, Laurie Cumbo, Robert Cornegy, Jr., Ben Kallos, Jimmy Van Bramer, Donovan Richards, Vanessa Gibson, Mark Treyger, Keith Powers, Rafael Salamanca, Jr., Karen Koslowitz, Antonio Reynoso, Carlos Menchaca, Daniel Dromm, Mark Levine, Justin Brannan, Eric Ulrich, Margaret Chin, Adrienne Adams, Paul Vallone, Andrew Cohen, Fernando Cabrera, I. Daneek Miller, and Ydanis Rodriguez.

    c. New York City Public Advocate Jumaane Williams and his predecessor, Letitia James.

    d. Manhattan Borough President Gale Brewer and Melinda Katz.

    e. New York City's District Attorneys.

    f. Judges and their support personnel.

3. When members of the public are illegally prevented from attending public forums that

government officials conduct or are similarly and illegally discriminated against at those public forums by being subjected to illegal segregation in regards to them by having their attendance restricted to overflow rooms instead of the rooms in which they're conducted while they're being conducted and while seating is available, Twitter and other social media platforms that include Facebook serve as alternate channels of lawful First Amendment expression between such members of the public and the following:

   a. Government officials who engage in offensive and disorderly conduct and otherwise condone such conduct that is committed in their presence by other government officials and members of the NYPD during **a)** public forums that are comprised of public hearings, public town hall meetings, and public resource fair meetings and **b)** illegal publicity stunts government officials conduct in public areas.

   b. Members of the public who attended such public forums within the rooms in which they were conducted or otherwise watched video recordings of those public forums that were recorded from within those rooms as they were conducted.

   c. Other members of the public who support, oppose, and are otherwise neutral with respect to the types of government officials that were just discussed in subparagraph "a" above.

   d. Actual journalists who vigorously defend First Amendment rights instead of people who sadly work in journalism and opt to censor whistleblowers.

   e. Government regulatory agencies that include the United States Department of Justice and the FBI.

4. Although I have repeatedly and truthfully testified about illegal acts that have been committed against me by the Mayor, his staff, members of his administration, and members of the NYPD in relation to public forums that have been conducted by the Mayor and other personnel who work for the City of New York during public hearings that New York City

Council committees have held while those hearings were recorded on video, I have no reason to believe that any member of the New York City Council complied with their Fourteenth Amendment affirmative legal duty to intervene on my behalf in regards to those illegal acts. Instead, such members of the New York City Council are often absent from such public hearings in which I testify while I testify in them in spite of the fact that they are members of the New York City Council committees to which I testify. Additionally, such members of the New York City Council also attend such public hearings in which I testify, but leave them before my turn to testify in them comes. Members of the New York City Council who are present during my testimony in such public hearings also otherwise choose to distract themselves by playing with their cell phones and in other ways as I testify instead of honoring my First Amendment and Fourteenth Amendment due process and equal protection rights to be heard at a meaningful time and in a meaningful way that is tailored to my circumstances and capacity to be heard. That legal standard that applies to due process rights was articulated in the decision that the U.S. Supreme Court issued in <u>Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970)</u>. Furthermore, other members of the New York City Council have been known to illegally impose prior restraints on my testimony in such public hearings that they haven't on other members of the public who have testified in those same and similar public hearings that New York City Council committees conduct. Ritchie Torres and Robert Cornegy, Jr. have done that to me during such public hearings.

5. What follows is a brief discussion that substantiates and otherwise clarifies my remarks in the preceding paragraph. The following is a link to a copy of the video recording that the New York City Council's committee on Oversight and Investigations conducted on 3/26/19 inside of the Committee Room located in side of New York City Hall that the New York City

Council arranged to be recorded on video:

https://councilnyc.viebit.com/player.php?hash=PVKea3TdHUTv

Ritchie Torres is sadly both the chairman of that New York City Council committee and the person to whom I truthfully and lawfully testified during that public hearing. My testimony begins at the elapsed time of 39 minutes and 34 seconds in that video recording. As I testified to him then for just a few minutes, I did so partly about the fact that I was illegally assaulted, harassed, and ejected on 3/18/19 from the public hearing that the Mayor held in the Blue Room located inside of New York City Hall that I discussed earlier in this letter. As I did so, I also played a video recording for the benefit of Judge Schofield, Mr. Torres, others in that room, and others who may have and may yet watch the video recording of that 3/26/19 public hearing. The video recording that I then played confirmed my claims about the public hearing that the Mayor conducted on 3/18/19 that I discussed above. Before I played that video recording then, Mr. Torres violated my Fourteenth Amendment due process and equal protection rights by subjecting me to selective enforcement that also relates to the "class-of-one" legal theory applicable to the Fourteenth Amendment. He did so by imposing an unlawful prior restraint on my First Amendment rights during that public hearing by asking me if there was any profanity in that video recording. A diligent review of video recordings of New York City Council public hearings that he has conducted and otherwise participated in reveals that he has consistently not asked other members of the public who have testified in them whether they will use profanity in their testimony prior to the start of their testimony. In that respect, the fact that Mr. Torres asked me that question was disorderly conduct by him and very offensive to my First Amendment and Fourteenth Amendment rights. During that same public hearing on 3/26/19, I also reminded him that I talked with him on 3/18/19

around 5 pm in the area located just outside of the Broadway entrance to New York City Hall shortly after I had been illegally **a)** ejected from a public hearing that the Mayor conducted inside of New York City Hall and **b)** coerced by members of the NYPD to leave New York City Hall's compound. I reminded Mr. Torres during that 3/26/19 hearing about the sum and substance of what he and I discussed on 3/18/19 during that face-to-face chat. I also told him then that I had recently visited the offices of the New York City Department of Investigations ("DOI") to make a complaint to it about illegal acts that were committed against me on 3/18/19 in relation to the public hearing that the Mayor held that I discussed above. Moreover, I also reminded him the about testimony that I gave to him on 3/26/18 during an earlier public hearing that he conducted for that same committee. The video recording that was recorded by the New York City Council of that 3/26/18 public hearing is available on the Internet at the following address:

https://councilnyc.viebit.com/player.php?hash=1diWh0EurD71

My testimony during that 3/26/18 public hearing begins at the elapsed time of 2 hours, 39 minutes, and 42 seconds from the beginning of that recording. Although I testified primarily to Mr. Torres during that hearing, some of my testimony during that hearing was also in response to good questions that New York City Council Kalman Yeger asked me during it. While I testified in that public hearing, I testified truthfully throughout it and my testimony lasted for just a few minutes. The following were some of the things that I testified about during that hearing:

- Members of the NYPD illegally subjected me to whistleblower retaliation by having prevented me from attending public forums that the Mayor held in 2017 and their actions constituted both voter fraud and voter suppression for the Mayor's benefit in violation of

5 U.S.C. §1502(a)(1) partly because those public forums were used as campaign events by the Mayor in 2017 as he ran for re-election as such. One of the public forums that the Mayor conducted that I was illegally prevented from attending was a public town hall meeting that was held on 10/4/17 in the Bronx that Mr. Torres conducted with the Mayor.

- Members of the NYPD illegally tried to prevent me from attending a public hearing that the Mayor held on 1/8/18 inside of the Blue Room located inside of New York City Hall. That public hearing partly concerned legislation on which Mr. Torres had worked that concerned reforms for the NYPD associated with the "Right-to-Know Act".

- I was then defending against an entirely frivolous criminal prosecution that the Bronx District Attorney's office commenced against me roughly 12 days after I testified against the NYPD on 12/14/17 during a public hearing that was conducted by New York City Councilmembers Corey Johnson and Vanessa Gibson inside of the Committee Room located inside of New York City Hall that was recorded on video for the New York City Council's Public Safety Committee. I told Mr. Torres and Mr. Yeger during that 3/26/18 public hearing that the frivolous criminal prosecution stemmed from my having been illegally stopped, seized, and arrested by members of the NYPD while I was lawfully conducting myself on 12/26/17 as I was then walking in a public area.

- When I talked with NYPD Commissioner James O'Neill on 2/23/18 at the New York Law School located in lower Manhattan about illegal acts that NYPD Commanding Officer Howard Redmond had been committing against me, Mr. O'Neill fraudulently claimed that I had filed a lawsuit against Mr. Redmond and that Mr. O'Neill refused to answer my questions that concerned a valid federal lawsuit that someone else filed against Mr. Redmond.

- I live in housing that is for military veterans in the Bronx. My landlord (Urban Pathways, Inc.) subjected me to an illegal bait-and-switch fraud in regards to a binding and fully-enforceable apartment lease agreement that I signed in the offices of the New York City Human Resources Administration ("HRA") that is among the agencies that comprise the Mayor's administration. My landlord is a business partner of HRA that gets funding from it to serve as the landlord of the building in which I reside. Taxpayers and voters make that funding available to HRA. The landlord of the building in which I reside had been neglecting to make repairs that were needed in that building. That landlord also didn't then have the building in which I reside validly registered with the New York City Department of Housing, Preservation & Development ("HPD"). Although I reported those deficiencies about that landlord to both HRA and HPD, neither of them were having appropriate corrective action taken in response. I then asked Mr. Torres if he would intervene in place of HRA and HPD for that matter. Mr. Torres then expressed that he and his staff could follow-up with HPD about what I reported to him. However, problems requiring repairs in the building in which I reside that I reported to him on 3/26/18 during that hearing have since not been fixed. That fact further demonstrates disorderly and offensive conduct by Mr. Torres for failing to have someone follow-up with me to ensure that the deficiencies that I referenced while I testified to him on 3/26/18 would be fully and properly resolved by now.
- I was assaulted on 7/2/16 in the apartment in which I reside by my former roommate due to fraud, forgery, and negligence by HRA and Urban Pathways, Inc. I didn't have sufficient time then to include all of those details in my testimony. My testimony about that point is at the elapsed time of 2 hours, 41 minutes, and 55 seconds from the start of

the video recording of that 3/26/18 public hearing.

6. Returning to my earlier discussion about the testimony that I gave to Mr. Torres on 3/26/19 during the public hearing that he conducted for the New York City Council's Committee on Oversight and Investigations that was conducted inside of the Committee Room located inside of New York City Hall, I talked about the following with Mr. Torres at the elapsed time of 42 minutes and 51 seconds from the start of the video recording that was recorded of that public hearing due to arrangements that the New York City Council made:

    a. HRA was illegally refusing to comply with FOIL demands that I submitted to it in violation of my rights pursuant to FOIL and the First Amendment.

    b. Records that I needed from HRA that pertained to those FOIL demands were essential for litigation in which I was then involved.

    c. I clearly asked Mr. Torres if he would intervene on my behalf to have HRA compelled to fully comply with my FOIL demands in his capacity as the chairman of that oversight committee. In response, Mr. Torres made a remark to me that was offensive to my First Amendment rights and my Fourteenth Amendment right to have him perform his affirmative legal duty to intervene on my behalf against HRA. His remark was offensive because he implied that I was not permitted to ask him a valid question during a public hearing.

7. Concerning what I just discussed about public hearings that Mr. Torres and the Mayor conducted on 3/26/19 and 3/18/19, links to video recordings that are available on the Internet that were recorded on those dates that further substantiate my claims about 3/18/19 that I have discussed in this letter and establish that members of the New York City Council's Committee on Oversight and Investigations violated my due process rights on 3/26/19 during

the public hearing that Mr. Torres then conducted by being absent from it are presented next.

    a. The following is a screenshot from a video recording that I received from the NYPD in response to a FOIL demand that I submitted to it:



The screenshot above is from a video recording that was recorded on 3/26/19 by video security cameras that the NYPD controls. That video recording was recorded as I testified to Ritchie Torres during the public hearing that he conducted on that date inside of the Committee Room in New York City Hall. One of the things that is very significant about what is proven by what is shown in that video is that it confirms that members of the New York City Council who are members of its Oversight and Investigations committee were absent from that hearing as I testified in violation of my constitutional due process rights to be heard in a meaningful way at a meaningful time.

    b. The following is a link to a video recording that is available on the Internet that I recorded with a cell phone on 3/18/19 of members of the NYPD immediately after I was ejected from the public hearing that the Mayor held that I discussed above:

https://drive.google.com/open?id=1YqFwxondVpHCgxISpm9kqHkrlMKikp_e

That video begins by showing NYPD Sergeant Jemaal Gungor. He was among the first members of the NYPD I encountered immediately after I was illegally ejected from the Blue Room inside of New York City Hall on 3/18/19. Mr. Gungor is heard in that video recording lying to me by fraudulently claiming that the public hearing that the Mayor conducted on that date from which I was illegally ejected wasn't a public hearing. He also illegally made no attempt to intervene on my behalf to try to enable me to re-enter that public hearing to lawfully complete my testimony in it. Another unknown member of the NYPD is shown in that video illegally coercing me to leave New York City Hall's compound while illegally refusing to tell me his name in response to a clear demand that I made to him for that information. Due to their actions against me on 3/18/19 at New York City Hall, both Mr. Gungor and that other unknown member of the NYPD violated both my First Amendment and Fourteenth Amendment rights as well as 18 U.S.C. §245(b)(5) and 18 U.S.C. § 241 by how they treated me then.

c. The following is a link to a video recording that is available on the Internet that I received from the NYPD in response to a FOIL demand that I submitted to it and was recorded on 3/18/19:

https://drive.google.com/open?id=1rTBOcU2txrQwI23vkaB2lRK90H8dsv1j

That video recording was recorded by a video security camera that the NYPD controls and shows an aerial view of the front of New York City Hall as Mr. Gungor and other members of the NYPD illegally coerced me to leave New York City Hall's compound. I'm seen in that video recording at the elapsed time of 54 minutes and 14

seconds as Mr. Gungor is escorting out of the main entrance to the New York City Hall building while I was wearing a white sweater.

   d. The following is a link to a video recording that is available on the Internet that I received from the NYPD in response to a FOIL demand that I submitted to it and was recorded on 3/18/19:

   https://drive.google.com/open?id=1IKBHpLvN7zSX6RLwaBiQ5G6a1JKokErR

   That video recording was recorded by a video security camera that the NYPD controls and shows a side view of New York City Hall from an area by Park Row as Mr. Gungor and other members of the NYPD illegally coerced me to leave New York City Hall's compound. I'm seen in that video recording at the elapsed time of 54 minutes and 20 seconds as Mr. Gungor is escorting out of the main entrance to the New York City Hall building while I was wearing a white sweater.

8. Concerning a decision that New York City Councilman Chaim Deutsch made to use a Twitter account that he uses to block one that I use, my experiences from having testified to directly to him during public hearings that committees of the New York City Council have conducted and otherwise talked with him outside of New York City Hall's building have confirmed that he is as disingenuous as Mr. Torres and the Mayor with regard to upholding civil rights and assisting military veterans. For obvious reasons, that fact is extremely offensive. What follows is a screenshot from a video recording that I received from the NYPD in response to a FOIL demand. That video recording was recorded on 11/27/17 near the Broadway entrance to New York City Hall. Mr. Deutsch and I are shown in that screenshot at 11:38 am as I stood next to the NYPD guardhouse that is located just inside of the Broadway entrance to New York City Hall. Mr. Deutsch is shown on the left side of that

screenshot while standing next to his car. At that time, NYPD Officer Cruz (badge #: 751) was inside of the guardhouse shown in that screenshot located to my right and was illegally violating my rights pursuant to the First Amendment, Fourteenth Amendment, and New York State's Open Meetings Law by not allowing me to proceed past that point to the NYPD security screening area in order to then be able to enter the New York City Hall building in order to attend and testify in a public hearing that the Mayor conducted at noon in the Blue Room in New York City Hall that concerned proposed legislation about privacy rights.



The following is a link to the public notice that is available on the Internet and was issued in an official New York City government report known as "The City Record" for the public hearing that the Mayor conducted on 11/27/17 that I just referred to:

https://a856-cityrecord.nyc.gov/RequestDetail/20171121102

The following is a link to a copy of the video recording that is available on the Internet that the Mayor's office arranged to be recorded of the public hearing that the Mayor conducted on 11/27/17 at noon within the Blue Room located inside of New York City Hall:

https://www.youtube.com/watch?v=gJovs33FfAk

During my interactions with Mr. Deutsch on 11/27/17, he illegally made no attempt to try to enable me to attend the public hearing that the Mayor conducted that I just discussed in violation of my Fourteenth Amendment rights and his legal duty to intervene. Mr. Deutsch is irresponsibly a staunch supporter of the NYPD.

My interests as they pertain to the transactions that are the subject of this lawsuit are not adequately represented by the parties in it nor their attorneys.

In the event that this Court needs clarification about anything that I have discussed in this letter, I respectfully request a conference with this Court for that purpose.

Thank you for your time and consideration.

Regards,

Towaki Komatsu